IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Rable,

Plaintiff,

v.

Sompo America Insurance Company,

Defendant.

Case No. 3:24-cv-00557-JGC

**ORDER**

This is a dispute regarding the extent of insurance coverage for a car accident.

Plaintiff Thomas Rable is the administrator of the estate of Atsushi Tanaka (the "Estate"). (Doc. 1-2, PgID. 11). Mr. Tanaka died in a car accident on January 6, 2022. (*Id.* at PgID. 14–16).

Defendant Sompo America Insurance Company ("Sompo") underwrote a commercial auto liability policy and an umbrella policy for Mr. Tanaka's local employer, Celina Aluminum Precision Technology. (*Id.* at PgID. 13, 16, 25, 82).

The Estate claims that Sompo owes the Estate certain underinsured motorist benefits under these policies. (*Id.* at PgID. 17–19). The Estate also claims that Sompo's continued denial of these benefits is in bad faith. (*Id.* at PgID. 20).

The Estate filed suit against Sompo in the Mercer County Court of Common Pleas. (Doc. 1-2). Sompo then removed the case to this court based on diversity of citizenship under 28 U.S.C. § 1332. (Doc. 1, PgID. 2–4). Pending is Sompo's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the Estate's complaint. (Doc. 5). The Estate responded, (Doc. 9), and Sompo filed a reply, (Doc. 10).

For the reasons that follow, I grant Sompo's motion and dismiss the Estate's claims with prejudice.

**Background**

Atsushi Tanaka was an engineer who worked for Honda Foundry, Ltd., a Japanese company. (Doc. 1-2, PgID. 13). In April 2021, Honda Foundry sent Mr. Tanaka on a three-year assignment to work for Celina Aluminum Precision Technology, Inc. (CAPT), a subsidiary in the United States. (*Id.*).

On January 6, 2022, however, Mr. Tanaka died in an auto accident in Mercer County, Ohio, when the vehicle he was driving collided with a semi-trailer truck. (*Id.* at PgID. 14–16). The Estate claims that Mr. Tanaka's death caused $2,177,801 in lost wages and other damages. (*Id.* at PgID. 16). Mr. Tanaka's family also paid funeral and transportation costs of approximately $9,246.08. (*Id.*).

The semi-trailer truck's insurance coverage paid the Estate $1 million minus a property damage lien of $7,043.98. (*Id.*). The Estate, however, claims that additional benefits are available to it under two Sompo insurance policies that Mr. Tanaka held through his employment with CAPT. (*Id.* at PgID. 16–17).[1]

First, the Estate alleges that Mr. Tanaka held a commercial auto liability policy from Sompo. (*Id.* at PgID. 16). This policy covered in relevant part "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' . . . caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." (*Id.* at PgID. 45). The

---

[1] The Estate does not explain in its complaint or briefing how Mr. Tanaka qualified as an insured under insurance policies naming only his employer as the insured. (*E.g.*, Doc. 1-2, PgID. 25, 84). But in its motion to dismiss, Sompo did not argue this point, instead reserving its right to later dispute the issue. (Doc. 5, PgID. 174). For purposes of this motion, I therefore assume without deciding that, as the Estate alleges, Mr. Tanaka qualified as an insured under the relevant policies.

auto policy also included an endorsement for uninsured and underinsured motorists (UM/UIM) coverage for bodily injury up to $1,000,000 for each accident. (*Id.* at PgID. 57–61).

Second, the Estate alleges that Mr. Tanaka held an umbrella policy from Sompo. (*Id.* at PgID. 16). This policy provided for up to $10,000,000 in excess coverage beyond the retained limits of certain underlying insurance policies. (*See id.* at PgID. 84, 87–88). One of these underlying policies was the commercial auto liability policy. (*Id.* at PgID. 87).

This dispute between the parties boils down to whether and, if so, how the auto policy coverage and umbrella policy coverage interact. Sompo argues that the umbrella policy's $10,000,000 limit does not apply to the auto policy's UM/UIM endorsement and that neither the auto policy nor the umbrella policy provides the Estate with UM/UIM coverage here. (Doc. 5; Doc. 10). The Estate argues that because the auto policy is an underlying insurance policy of the umbrella policy, the umbrella policy's $10,000,000 limit is available under the auto policy's UM/UIM endorsement. (Doc. 1-2, PgID. 16–17; Doc. 9).

**Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), I decide whether a plaintiff's complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). This statement must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. And I "must construe the complaint in the light most favorable to the plaintiff and accept all [factual] allegations as true." *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)). Finally, "when a

3

document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007). Here, the insurance policies are integral to the Estate's claims.

Under Ohio law, "[a]n insurance policy is a contract whose interpretation is a matter of law." *Acuity v. Masters Pharm., Inc.*, 205 N.E.3d 460, 465 (Ohio 2022); *Huntington Nat'l Bank v. AIG Specialty Ins. Co.*, No. 23-3039, 2024 WL 374571, at *5 (6th Cir. Feb. 1, 2024) ("Under Ohio law, an insurance policy is a contract between the insurer and the insured. The interpretation and construction of insurance policies is a matter of law to be determined by the court using general rules of contract interpretation and construction." (internal citations omitted)).[2]

An insurance policy's terms "are to be given their plain and ordinary meaning." *Acuity*, 205 N.E.3d at 465. "Courts must examine an insurance contract as a whole and presume that the language used in the policy reflects the intent of the parties." *Id.* "Where the provisions of an insurance policy are clear and unambiguous, courts must apply the terms as written." *Huntington*, 2024 WL 374571, at *5. "A provision in an insurance policy is ambiguous if it has more than one reasonable interpretation." *Id.* And "[i]t is 'well-settled' in Ohio law that, 'where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.'" *Id.* (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988)).

---

[2] No party disputes, and I agree, that Ohio law applies here. *Lukowski v. CSX Transp., Inc.*, 416 F.3d 478, 484 (6th Cir. 2005) ("A federal court sitting in diversity applies the substantive law of the state in which it sits."); *see also Ciena Healthcare Mgmt., Inc. v. Hartford Fire Ins. Co.*, 686 F. Supp. 3d 625, 629 (N.D. Ohio 2023) (Carr, J.) ("[A]n actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken." (quoting *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006))).

## Discussion

Resolution of this dispute hinges on the answers to two questions. First, does the plain language of either the auto policy or umbrella policy provide the insurance coverage that the Estate seeks? And if not, does ambiguity within the policies require that I nevertheless find such coverage applicable? I agree with Sompo that the answer to both questions is no.

I turn first to the terms of the auto policy. That policy included an endorsement for UM/UIM bodily injury coverage. (Doc. 1-2, PgID. 57–61). The endorsement provides that Sompo "will pay all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or operator of an 'uninsured motor vehicle' or 'underinsured motor vehicle' because of 'bodily injury' sustained by the 'insured' and caused by an 'accident'." (*Id.* at PgID. 57).[3]

The endorsement establishes a coverage limit of $1 million. (*Id.*). The endorsement also defines an "underinsured motor vehicle" as:

> [A] land motor vehicle for which the sum of all liability bonds or policies applicable at the time of an "accident" is either:
> a. Less than the limit of liability for this coverage; or
> b. Reduced by payments to others injured in the "accident" to an amount which is less than the limit of liability for this coverage.

(*Id.* at PgID. 61).

In its complaint, the Estate alleges that it received a $1 million payment from the semi-trailer truck's insurer. (*Id.* at PgID. 16). That payment was neither less than the limit of liability

---

[3] Words in quotation marks within the policies at issue here have "special meaning" as defined in the policies. (Doc. 1-2, PgID. 44, 93). Where relevant, I further discuss those definitions.

for Mr. Tanaka's underinsured motorist coverage nor reduced by payments to others to an amount less than that limit.[4]

By the unambiguous terms of the UM/UIM endorsement within Mr. Tanaka's auto policy, the semi-trailer truck was not an underinsured motor vehicle. *See Cincinnati Cos. v. Albers*, No. 10-03-10, 2004 WL 324849, at *4–5 (Ohio Ct. App. Feb. 23, 2004) (finding that a vehicle was not an underinsured vehicle where the insured's UM/UIM endorsement contained equivalent language and the limits of the vehicle's liability policy equaled the insured's UM/UIM coverage limits). The auto policy here, standing alone, does not require that Sompo pay underinsured motorist benefits to the Estate.

I next turn to the provisions of Mr. Tanaka's umbrella policy. The Ohio Supreme Court has explained:

---

[4] In its briefing, the Estate argues that the reduction of its $1 million payment from the semi-trailer truck insurer to cover a property damage lien of $7,043.98 paid to Auto Owners Insurance Company sufficed to trigger the auto policy's underinsured motorist benefits under the provisions discussed above. (Doc. 1-2, PgID. 16; Doc. 9, PgID. 207). I disagree.
    For purposes of calculating an insured's available UIM coverage, Ohio law is clear that payments from an underinsured vehicle's insurer accruing to the benefit of the insured apply toward that insured's UIM policy limit. *See Littrell v. Wigglesworth*, 746 N.E.2d 1077, 1087 (Ohio 2001) (holding that an insured's "expenses and attorney fees are not part of the setoff equation"); *Gilliland v. Nationwide Prop. & Cas. Ins. Co.*, 936 N.E.2d 524, 528 (Ohio Ct. App. 2010) (holding that, where "the pot [of available UIM coverage] is simply diminished because of expenses that the claimant [] incurred," those expenses apply toward the claimant's UIM policy limit); *Wickerham v. Progressive Ins. Cos.*, 849 N.E.2d 1070, 1072 (Ohio Ct. App. 2006) ("[P]ayments to other insureds under a policy do reduce the total amount of underinsured-motorist coverage available to an insured."). This rule reflects the state's policy that "underinsured motorist coverage was not intended to be excess insurance to the tortfeasor's liability coverage" and that "a person injured by an underinsured motorist should never be afforded greater coverage than that which would be available had the tortfeasor been uninsured." *Littrell*, 746 N.E.2d at 1084.
    Here, the Estate sheds no light in its complaint on the precise nature of the $7,043.98 property damage lien at issue. But in its briefing, the Estate makes clear that "the [semi-trailer truck's] insurance paid the Estate a total of $1 million" and "[o]ut of that $1 million payment, the Estate paid property damage costs of $7,043.98 to Auto Owners Insurance Company." (Doc. 9, PgID. 194). Based upon this statement, I conclude that the entirety of the $1 million payment received from the semi-trailer truck's insurer accrued to the benefit of the Estate. I therefore also conclude that the entirety of that payment applies toward the Estate's UIM coverage under Mr. Tanaka's auto policy.

> An umbrella policy is a policy which provides excess coverage beyond an insured's primary policies. Umbrella policies are different from standard excess insurance policies, since they provide both excess coverage ("vertical coverage") and primary coverage ("horizontal coverage"). The vertical coverage provides additional coverage above the limits of the insured's underlying primary insurance, whereas the horizontal coverage is said to "drop down" to provide primary coverage for situations where the underlying insurance provides no coverage at all.

*Granger v. Auto-Owners Ins.*, 40 N.E.3d 1110, 1116 (Ohio 2015) (internal citations omitted) (quoting *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 33 (Ohio 2007)).

Here, Mr. Tanaka's umbrella policy provides in relevant part that Sompo "will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. 1-2, PgID. 93). The umbrella policy defines "ultimate net loss" as "the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages." (*Id.* at PgID. 110). The policy defines "retained limit" as "the available limits of 'underlying insurance' scheduled in the Declarations." (*Id.* at PgID. 109). And finally, the policy defines "underlying insurance" as "any policies of insurance listed in the Declarations under the Schedule of 'underlying insurance.'" (*Id.* at PgID. 110). The umbrella policy did include the auto policy, among others, in the umbrella policy's schedule of underlying insurance. (*Id.* at PgID. 87).

I conclude that the umbrella policy's unambiguous language, like that of the auto policy, does not provide the Estate with underinsured motorist benefits.

In the first place, the umbrella policy contains no explicit provision for UM/UIM benefits. Indeed, as Sompo points out, the umbrella policy includes only two references of any kind to such benefits.

First, the policy's auto coverage exclusions include an exclusion for "any loss, cost or expense payable under or resulting from any . . . uninsured or underinsured motorist law." (*Id.* at PgID. 95). The Estate argues that to read the umbrella policy as failing to provide UM/UIM benefits would improperly render this exclusion superfluous. (Doc. 9, PgID. 205); *see Motorists Mut. Ins. Co. v. Ironics, Inc.*, 200 N.E.3d 149, 158 (Ohio 2022) (collecting cases and noting that "courts avoid interpretations of insurance-coverage provisions that render exclusions superfluous"). But there is nothing superfluous about the exclusion of UM/UIM benefits by operation of law in a policy that does not otherwise provide for such benefits by its terms. Indeed, it is the Estate's preferred reading of the umbrella policy that would seem to render the exclusion superfluous—if the umbrella policy affirmatively provided UM/UIM benefits, excluding their provision by operation of law would seem irrelevant.

The second mention of UM/UIM benefits in the umbrella policy lends further support to the conclusion that the policy does not by its terms provide such benefits. In an exclusion titled a "Public or Livery Passenger Conveyance and On-Demand Delivery Services Exclusion," the umbrella policy provides for certain modifications to its terms where "Excess Uninsured and/or Underinsured Motorists Coverage is attached." (Doc. 1-2, PgID. 132). The absence of such an attachment in the umbrella policy at issue here suggests the parties could have but chose not to include UM/UIM benefits in that policy.

Finally, as I noted above, the policy provides coverage in relevant part only for the insured's "ultimate net loss." (*Id.* at PgID. 93). The policy defines this term as "the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages." (*Id.* at PgID. 110). This definition excludes sums that others become legally

8

obligated to pay the insured. Put another way, the umbrella policy at issue here unambiguously covers only those damages that the insured is liable for and not those that the insured suffered.[5]

Having concluded that neither the auto policy nor the umbrella policy standing alone provides the insurance coverage that the Estate seeks, I now turn to the Estate's final argument—that the two policies, considered together, create ambiguity regarding the extent of UM/UIM coverage that I must resolve in favor of the Estate.

Under Ohio law, "[a] provision in an insurance policy is ambiguous if it has more than one reasonable interpretation." *Greater N.Y. Mut. Ins. Co. v. Camelot Apartments LLC*, No. 21-cv-1032, 2024 WL 1347117, at *7 (N.D. Ohio Mar. 30, 2024) (Brennan, J.) (citing *Hacker v. Dickman*, 661 N.E.2d 1005, 1006 (Ohio 1996)). And "where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *Id.* (quoting *Huntington*, 2024 WL 374571, at *5).

---

[5] The parties also spar over the effect of the umbrella policy's loss-payable condition on this analysis. That condition provides that no loss becomes payable under the umbrella policy until "[t]he insured . . . has become obligated to pay the 'retained limit.'" (Doc. 1-2, PgID. 106). The policy defines that limit as "the available limits of 'underlying insurance' scheduled in the Declarations." (*Id.* at PgID. 109).
 Sompo argues that because, as discussed above, Mr. Tanaka's underlying auto policy does not in this case require Sompo to pay underinsured motorists benefits to the Estate, the umbrella policy's loss-payable condition forecloses such payments under the umbrella policy, as well. (*See* Doc. 5, PgID. 175–76). The Estate responds that this is an "absurd construction" of the umbrella policy, in which the loss-payable condition "would forever bar recovery under an umbrella policy in a situation where the tortfeasor's limits matched the insured's underlying policy limits." (Doc. 9, PgID. 207).
 But the absurdity the Estate purports to identify reflects a combination of both Sompo's and the Estate's misunderstandings of the policy at issue. Again, Mr. Tanaka's umbrella policy, through its definition of "ultimate net loss," covers only those damages that the insured is liable for, not those that the insured suffered. The loss-payable condition further reflects this aspect of the policy's coverage through that condition's focus on what "[t]he insured . . . has *become obligated to pay*." (Doc. 1-2, PgID. 106 (emphasis added)). These definitions, as well as the absence of any affirmative grant of UM/UIM coverage elsewhere in the umbrella policy, are what function to preclude UM/UIM coverage under that policy. Whether Sompo must pay the Estate for an underinsured motorist through the underlying auto policy's UM/UIM endorsement has no bearing on what the Estate might owe others for purposes of the umbrella policy. The umbrella policy's loss-payable condition is simply irrelevant to the analysis here.

9

Here, the Estate emphasizes that "the Declaration page of the Umbrella Policy expressly lists the Underlying [auto] Policy as a covered policy in the Umbrella." (Doc. 9, PgID. 204–05). The Estate also highlights that "[t]he Underlying Policy inarguably includes UIM coverage" and that "[t]he Umbrella Policy contains no express exclusion" for such coverage. (*Id.* at PgID. 205). Relying on these facts, the Estate contends that the interaction between the auto and umbrella policies, including the extent to which the umbrella policy might provide UM/UIM coverage through the underlying auto policy, is therefore ambiguous. (*See id.* at PgID. 202–05).

Sompo argues, however, that Ohio law forecloses this argument. I agree.

In *Arn v. McLean*, for example, Ohio's Second District Court of Appeals considered whether an umbrella policy was ambiguous where the policy made no provision for UM/UIM coverage but noted generally in defining its underlying policies that, for UM/UIM coverage to attach under the umbrella policy, an underlying auto policy with such coverage must also exist. 825 N.E.2d 181, 187–88 (Ohio Ct. App. 2005). The insured party in *Arn* argued that this definition could "be read to mean that the umbrella policy must include UM coverage if it is shown in the declarations section of the underlying automobile policy." *Id.* at 187. The Court of Appeals, however, disagreed that such an ambiguity existed. Instead, the court held:

> [T]he mere fact that a particular type of risk is covered in an underlying policy does not mean that it is also covered by the umbrella policy. Instead, the declarations page of the umbrella policy and the policy contents must be consulted to see what type of coverage is provided.

*Id.* at 188.

Ohio's Fourth District Court of Appeals reached a similar conclusion regarding the application of an umbrella policy in *Gilkey v. Grange Mutual Casualty Co.*, No. 16CA12, 2016 WL 6600001 (Ohio Ct. App. Nov. 1, 2016). In that case, the insured held an umbrella policy

10

with a declarations section requiring that the insured "keep the underlying insurance coverages and limits of insurance shown in this schedule in full effect throughout the policy period." *Id.* at *2. The policy listed the required underlying insurance policies, which included an auto policy providing UM/UIM coverage. *Id.* at *1–2. However, the declarations section "did not state that the coverages of the underlying policies were incorporated into the new umbrella policy and did not include any statement that the policy included UM/UIM coverage." *Id.* at *2. The policy also contained an exclusion stating that "[t]his insurance does not apply to: * * * 'Bodily injury' to you or to any 'insured' * * *." *Id.*

"[G]uided by the language of the policy," the *Gilkey* court found that "the declarations do not incorporate the coverages of the underlying insurance policies; they merely identify the underlying policies as a condition for acquiring and maintaining umbrella coverage." *Id.* at *4. The court also concluded that the "umbrella policy's own terms specifically stated that it did not cover bodily injury to any insured, . . . so it unambiguously precluded UM/UIM coverage." *Id.*

*Arn* and *Gilkey* stand for the proposition that references to underlying insurance policies in an umbrella policy do not, in and of themselves, make the extent of coverage under that umbrella policy ambiguous. Furthermore, such references to underlying policies do not, in and of themselves, result in the incorporation of the underlying coverage into the coverage that the umbrella policy provides. Instead, courts must rely on the terms of the umbrella policy to evaluate the relationship between that policy and any underlying policies and to assess any potential ambiguity.

Applying these principles here, I conclude that Mr. Tanaka's UM/UIM coverage through his underlying auto policy does not make ambiguous the lack of such coverage through his umbrella policy.

11

First, the cases discussed above plainly foreclose the Estate's argument to the contrary to the extent that argument depends merely on the inclusion of the auto policy in the umbrella policy's schedule of underlying policies. (*See* Doc. 9, PgID. 195). Indeed, *Gilkey* makes clear that such a list of underlying policies in an umbrella policy, without more, does not make the umbrella policy's coverage ambiguous.

Second, the Estate's efforts to distinguish the list of underlying insurance in the *Gilkey* umbrella policy from the list included in the umbrella policy at issue here are ultimately unpersuasive. Admittedly, in *Gilkey* the purpose of the umbrella policy's underlying-insurance list appears to have been only to set a condition on the provision of coverage under the umbrella policy. *See Gilkey*, 2016 WL 6600001, at *2. Here, by contrast, the schedule of underlying insurance serves as the umbrella policy's reference point for identifying the policy limits above which the umbrella policy's "ultimate net loss" coverage kicks in. (*See* Doc. 1-2, PgID. 93, 109 (covering "on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit'" and defining "retained limit" as "the available limits of 'underlying insurance' scheduled in the Declarations")).

This is a distinction without a difference, however, because both the umbrella coverage in *Gilkey* and Mr. Tanaka's umbrella coverage here contain some form of an exclusion that operates to bar UM/UIM coverage for the insured in both cases. In *Gilkey*, that exclusion stated that "[t]his insurance does not apply to: * * * 'Bodily injury' to you or to any 'insured' * * *." *Gilkey*, 2016 WL 6600001, at *2. Here, that exclusion takes the form of the definition of "ultimate net loss," which, as discussed above, covers only damages "that the insured becomes legally obligated to pay." (Doc. 1-2, PgID. 110). Thus, Mr. Tanaka's umbrella policy operates, as

12

the policy in *Gilkey* did, to unambiguously preclude payments to an insured through UM/UIM coverage.[6]

Finally, the Estate's reliance on *Stubbe v. Guidant Mutual Insurance Co.*, 651 N.W.2d 318 (Wis. Ct. App. 2002), is unconvincing.[7] In *Stubbe*, the Wisconsin Court of Appeals, applying Wisconsin law, considered whether certain references to UM/UIM coverage in an umbrella policy created ambiguity regarding whether that policy provided such coverage. *Id.* at 322–25. These references included: (1) a mark next to the word "included" beside a subheading for "Underinsured Motorist," itself underneath a heading for "AUTOMOBILE LIABILITY" in the umbrella policy's schedule of underlying insurance; (2) a provision excluding UM/UIM coverage; and (3) a provision deleting "in its entirety" that UM/UIM coverage exclusion. *Id.* at 323–24. The *Stubbe* court concluded that these references created ambiguity as to whether the umbrella policy provided UM/UIM coverage and construed that ambiguity against the insurer. *Id.* at 325.

I do not find *Stubbe* persuasive here. First, the schedule of underlying insurance within Mr. Tanaka's umbrella policy, like that of the policy in *Stubbe*, did list the auto policy through which Mr. Tanaka had UM/UIM coverage. But unlike the auto policy listing in the umbrella policy in *Stubbe*, the listing of Mr. Tanaka's auto policy in his umbrella policy makes no mention of the UM/UIM coverage that the auto policy provided. And second, unlike the umbrella policy in *Stubbe*, the umbrella policy at issue here does not contain conflicting provisions regarding the

---

[6] The Estate also argues that, unlike the insured party in *Gilkey*, here Mr. Tanaka "sought and paid for [UM/UIM coverage] as part of the Umbrella Policy . . . when [he] paid for the Underlying Policy (which expressly included UIM benefits) to be a covered policy." (Doc. 9, PgID. 197). This contention, however, hinges on an interpretation of Mr. Tanaka's umbrella policy that I have just rejected.

[7] In *Stubbe*, the Wisconsin Court of Appeals applied Wisconsin law and did not discuss Ohio law. Nevertheless, I engage with *Stubbe* here as potentially persuasive precedent to the extent it addresses similar issues and does not conflict with Ohio law.

13

existence of a UM/UIM exclusion within the umbrella policy. As I previously discussed, the umbrella policy here simply does not include any relevant mention of UM/UIM coverage. These factual differences distinguish *Stubbe* from the case at bar.

Lastly, I briefly turn to the Estate's bad-faith claim. "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Thombre v. Grange Ins. Co.*, No. L-21-1014, 2021 WL 5229170, at *6 (Ohio Ct. App. Nov. 10, 2021) (quoting *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994)). "[I]f a reason for coverage denial is correct, it is per se reasonable." *Id.* (quoting *D'Ann Enters. Inc. v. Nationwide Ins. Co.*, No. OT-04-031, 2005 WL 2266798, at *4 (Ohio Ct. App. Sept. 2, 2005)). Because I have concluded that Sompo's denial of UM/UIM coverage under Mr. Tanaka's policies was correct, I find that denial was not in bad faith.

### Conclusion

For the foregoing reasons, it is ORDERED THAT:

1. Sompo's motion to dismiss (Doc. 5) be, and the same hereby is, granted; and

2. The Estate's claims are dismissed with prejudice.

SO ORDERED.
Date: 11/15/2024

/s/ James G. Carr

Sr. U.S. District Judge